## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Qwinstar Corporation,

<table>
<tr><td style="padding-left:3em">Plaintiff,</td><td>Civ. No. 15-2343 (RHK/FLN)</td></tr>
<tr><td></td><td>**MEMORANDUM OPINION**</td></tr>
<tr><td>v.</td><td>**AND ORDER**</td></tr>
</table>

Curtis Anthony, and Pro Logistics, LLC,

        Defendants.

---

John L. Sinatra, Jr., Hodgson Russ, L.L.P., Buffalo, New York, Court J. Anderson, Benjamin J. Hamborg, Daniel C. Oliverio, David Bradley Olsen, Henson & Efron, P.A., Minneapolis, Minnesota, for Plaintiff.

Adrianna Shannon, Bonnie M. Smith, Shannon Law L.L.C., Minneapolis, Minnesota, for Defendants.

---

## INTRODUCTION

Pursuant to two written contracts, Plaintiff Qwinstar Corporation ("Qwinstar") purchased replacement parts for check-processing equipment from Defendant Pro Logistics, LLC ("Pro Logistics") and hired Defendant Curtis Anthony, Pro Logistics's owner, to manage the supply of those parts. One year later, it terminated Anthony after discovering a purported parts shortage. It then commenced this action, alleging *inter alia* claims for breach of contract, fraud, conversion, and civil theft. Anthony and Pro Logistics have counterclaimed, alleging breach of contract, fraud, and unjust enrichment. Presently before the Court are the parties' cross-Motions for Summary Judgment. For the

following reasons, Qwinstar's Motion will be denied, and Anthony and Pro Logistics's

Motion will be granted.[1]

## BACKGROUND

Qwinstar is a Minnesota corporation that maintains paper-check-processing

equipment, including the IBM 3890 (the "3890").[2]  (Grunberg Dep. 12.)  To facilitate its

maintenance services, it buys and stores replacement 3890 parts.  At some point before

2007, it started buying 3890 parts from Pro Logistics, a company owned by Anthony.

(Atchley Dep. 10.)  It also competed with Pro Logistics in the 3890 parts market, at times

bidding for the same parts and effectively "running the price up for each other."  (Id. 61.)

The development of electronic check processing led to less reliance on the IBM

3890 and a corresponding decline in the market for 3890 parts and maintenance.

(Diadone Dep. 25–28; George Dep. 55–56.)  As a result, in May 2012, Qwinstar and Pro

Logistics began negotiations to change their relationship.  (Atchley Dep. 63–64.)

According to Qwinstar, Anthony suggested that it "acquire him and his company."  (Id.

40.)  By contrast, Anthony testified that Qwinstar first proposed a deal.  (Anthony Dep.

46.)  Regardless, partnership discussions followed.  Qwinstar was primarily interested in

---

[1] Anthony and Pro Logistics have also moved to exclude evidence from Qwinstar's expert witnesses under Federal Rule of Evidence 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Because the Court concludes summary judgment is appropriate, it need not and does not reach that Motion.

[2] The IBM 3890, originally released in 1974, reads encoded information and endorsements on paper checks and sorts them at a rate of over 2,000 checks per minute.  (George Dep. 57.)  IBM no longer manufactures the 3890.  (Id.)

Pro Logistics's stock of 3890 parts, while Anthony sought employment at Qwinstar. (Atchley Dep. 64, 69.)

Anthony opened the parties' discussions by touting Pro Logistics's sales numbers and its supply of "over 2.5 million in IBM 3890 new parts . . . [and] numerous 3890 [machines]." (Shannon Decl. Ex. 30.)  He also claimed that Pro Logistics had an "endless stream of suppliers and vendors with very good relationships." (Id.)  In late 2012, Anthony again praised Pro Logistics's "substantial inventory of IBM 3890 parts, 85% new." (Shannon Decl. Ex. 29.)  Qwinstar eventually requested a list of Pro Logistics's 3890 parts inventory.  (Grunberg Dep. 19; Anthony Dep. 52.)

On January 10, 2013, Anthony e-mailed Qwinstar a fifty-six page inventory list complete with part numbers, quantities, and descriptions for each line item.  (See Shannon Decl. Ex. 9.)  Following the final entry, the inventory provided a total parts value of over $4.7 million.[3]  (Id.; Atchley Dep. 106.)  Anthony told Qwinstar that the inventory "listed everything" Pro Logistics owned as of January 2013.  (Shannon Decl. Ex. 33.)  He apologized for "the teardrops" on the list, explaining that he went "Stage 4 Carpal Tunnel" during the inventory process (Shannon Decl. Ex. 9), which referred to "the agonizing task[] of inventorying washers, nuts, and screws." (Anthony Dep. 58.)  Anthony testified that, at the time he sent the inventory, he believed it was accurate.  (Id. 59.)

---

[3] The estimated value was later reduced to $4.4 million after Qwinstar discovered duplicate entries.  (Grunberg Dep. 22; Atchley Decl. ¶ 10.)

In spring 2013, Qwinstar sent Gary George, its Manager of Technical Services, to assess Pro Logistics's parts inventory. (George Dep. 6.) George's purpose was to decide whether Qwinstar should purchase Pro Logistics's parts, "not necessarily to count the stuff." (Id. 10.) George toured Pro Logistics's warehouse and, after his visit, told Qwinstar management that Pro Logistics's parts were "desirable." (Id. 9.) He visited Pro Logistics again in September 2013 "to look over the stuff," this time accompanied by John Atchley, Qwinstar's Managing Director. (Id. 21–22.) George testified that "nothing noticeable" had changed between his first and second visit (id. 21), but neither George nor Atchley inventoried the parts. George did not bring Anthony's inventory list with him to Pro Logistics on either visit in 2013; in fact, George never saw Anthony's list prior to his visits, and Qwinstar never asked George to estimate the value of Pro Logistics's parts. (Id. 11, 22.) Qwinstar owner Norman Grunberg also visited Pro Logistics's warehouse at some point in 2013—he does not recall when—to "eyeball" Pro Logistics's parts. (Grunberg Dep. 23.) He "saw a lot of parts" as Anthony "opened bin after bin after bin," but did not perform an exact count. (Id. 24.)

As negotiations continued, Anthony again touted Pro Logistics's "good rapport and customer base offering supplies to customers such as HP, IBM, Canon, BancTec, NEC, Toshiba, and Printronix." He claimed that "this [deal] would[] bring *millions of dollars* of IBM parts" to Qwinstar (Shannon Decl. Ex. 31 (emphasis in original)), and he predicted that "Qwinstar would IMMEDIATELY realize a substantial [sic] increase in sales of parts and supplies, approximately 1000 percent/plus the first year, to only expand . . . over the next decade of business." (Id.) In his view, the deal brought "NO RISK to

the table for [Qwinstar]."  (Id.)  He sought only a "fair salary over the next 5 years" in exchange.  (Id.)

Ultimately, the parties' executed two contracts effective October 1, 2013: an Asset Purchase Agreement ("APA") and an Employment Agreement ("EA").  Under the APA, Qwinstar purchased "assets[] held, used, or otherwise relating to [Pro Logistics's] 3890 business . . . [including] all finished goods, raw materials, work in process, packaging, *parts*, supplies, tooling, and other inventory."  (Shannon Decl. Ex. 15, ¶ 1.1 (emphasis added).)  Pro Logistics agreed to store this inventory at its Oklahoma facility at no cost, and Anthony agreed to ship the inventory as directed by Qwinstar.  (Id. ¶ 4.1.)  In consideration, Anthony and Pro Logistics received $50,000.  (Id. ¶ 1.3; Anthony Dep. 22.)  Execution of the APA was conditioned upon the contemporaneous execution of the EA (Shannon Decl. Ex. 15, ¶ 1.5.), under which Anthony became an employee of Qwinstar, as its Corporate Supply Chain Director for five years—his responsibilities included managing the supply of 3890 parts Qwinstar purchased under the APA.  (Id. Ex. 16, ¶ 1(a).)  Anthony was to "devote [his] full business time and attention to the[se] duties" in exchange for an annual salary of $200,000 (id. ¶¶ 1–2), and Qwinstar could terminate Anthony at any time for "cause" as defined by the EA.  (Id. ¶ 4.)  In sum, under these contracts, Qwinstar bought "all" of Pro Logistics's 3890 parts and employed Anthony to manage the supply of those parts in exchange for a five-year salary and payments totaling $1,050,000.  Though structured as two separate agreements, Anthony's salary under the EA was "really the vehicle to pay for the parts."  (Grunberg Dep. 36.)

Anthony performed his new duties for roughly one year but, by fall 2014, he allegedly "claimed to run out of certain parts that should have existed" (Atchley Decl. ¶ 16), although he does not recall making such a claim.  (Anthony Dep. 77.)  To investigate, Qwinstar sent George and former employee Rodney Moore to Pro Logistics's warehouse.  (George Dep. 30.)  While there, George observed that "the remaining inventory was sparse compared to the quantity that [he] observed a year earlier." (George Decl. ¶ 4.)  Similarly, Moore was "shocked by how few IBM 3890 parts were there," even though it was his first visit.  (Supp. Moore Decl. ¶ 7.)  They did not see all the remaining parts—Anthony had intermixed his personal property with Qwinstar's parts, so he "directed [George] to what he wanted [George] to see."  (George Dep. 30.) There were areas of the facility that George and Moore did not see at all.  (Moore Decl. ¶ 14.)  And, once again, the two "were not going to complete a full inventory."  (Id. ¶ 10.) George did not bring a copy of the inventory list Anthony had prepared.  (Id. 31.) According to Moore, the pair spent at most six hours at Pro Logistics's warehouse over the course of their two-day trip.[4]  (Moore Decl. ¶¶ 11–13.)

On November 18, 2014, after this purported parts shortfall was discovered, one of Qwinstar's owners asked Anthony by e-mail, "Of the $4.6 Mil in inventory in Oklahoma[], it is my understanding there is very little product left.  We agree that

---

[4] Moore and George "were tired after traveling all day," so, on the first day of their trip, they spent at most two hours at Pro Logistics's facility.  (Moore Decl. ¶ 11.)  Then, on the second day, they did not arrive until 2:15 p.m., and they left three or four hours later when Moore became ill "because of the heat."  (Id. ¶¶ 12–13.)  By supplemental declaration, Moore claimed that Anthony appeared intoxicated, lost his temper, and threw them off his property.  (Supp. Moore Decl. ¶ 6.)  He also added that he saw no more than $5,000 worth of parts.  (Id.)

approximately $1.0 Mil was shipped to St. Paul, where is the rest?"  (Shannon Decl. Ex. 19.)  According to Qwinstar, Anthony never answered this question to its satisfaction, even after it posed the question to him in person.  (Diadone Dep. 81 ("I didn't get any answer that would substantiate what the difference was."); Atchley Dep. 172 ("He did not respond . . . He didn't talk.").)  Anthony does not recall discussing a parts shortage. (Anthony Dep. 78–81.)

By December 2014, Qwinstar decided to ship all remaining 3890 parts from Pro Logistics to Qwinstar's St. Paul warehouse.  (Atchley Dep. 175.)  Qwinstar employees Marlin Brown and Howard Ridgeway were sent to Oklahoma to "pack up everything and bring it back."  (Id. 175.)  But they were not instructed to inventory the remaining parts (id. 176), they scrapped four truckloads of parts at George's direction (George Decl. ¶ 5; Moore Decl. ¶ 15), and they left parts behind.  According to Brown, they left "very little" behind, so they made no effort to track those parts.  (Brown Dep. 22–23.)  However, according to Anthony, Qwinstar "abandoned 70 percent of the items" that remained.[5] (Anthony Dep. 30.)

On January 28, 2015, Qwinstar retroactively terminated Anthony's employment "for cause effective December 15, 2014" and stopped paying him.  (Shannon Decl. Ex. 24.)  Then, on May 4, 2015, it filed this action, alleging breach of contract, fraud, conversion, and civil theft under Minnesota Statutes section 604.14.  Anthony and Pro Logistics filed counterclaims alleging breach of contract, fraud, and unjust enrichment.

---

[5] Qwinstar employees returned to Oklahoma in June 2016 to collect remaining inventory. (Brown Dep. 37.)  At oral argument, Qwinstar clarified that it has now retrieved all remaining parts.

On July 7, 2016, Anthony and Pro Logistics moved for summary judgment and, on August 9, 2016, Qwinstar moved for partial summary judgment, leaving the issue of damages for trial.  The Motions have been fully briefed, and the Court heard argument on October 13, 2016.  The Motions are ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078–79 (8th Cir. 2008).

Where, as here, the Court confronts cross-motions for summary judgment, this approach is only slightly modified.  When considering Qwinstar's Motion, the Court views the record in the light most favorable to Defendants, and, when considering Defendants' Motion, the Court views the record in the light most favorable to Qwinstar.

"Either way, summary judgment is proper if the record demonstrates that there is no genuine issue as to any material fact." Seaworth v. Messerli, Civ. No. 09-3437, 2010 WL 3613821, at *3 (D. Minn. Sept. 7, 2010) (Kyle, J.), aff'd, 414 F. App'x 882 (8th Cir. 2011).

## ANALYSIS

### I.    Qwinstar's breach-of-contract claim

Qwinstar first claims that Anthony and Pro Logistics breached the APA by failing to provide "the vast majority of the inventory they sold Qwinstar."[6]  (Pl.'s Mem. in Supp. 16.)  Anthony contends that Qwinstar received all of the assets it purchased (Anthony Decl. ¶ 10), and he argues that Qwinstar cannot show a genuine issue whether he breached the APA because it cannot identify any specific parts it bought but did not receive.  The Court agrees; in the Court's view, Qwinstar's failure to account for the parts it purchased is fatal to its breach-of-contract claim.

In Minnesota,[7] to prove a breach of contract, a party must show (1) a contract existed, (2) the non-breaching party performed any conditions-precedent, and (3) the other party breached.  Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co., 848 N.W.2d 539, 543 (Minn. 2014).  "A court [must first] determine whether a written contract is ambiguous, and if it is unambiguous, the court is to construe the contract as a matter of

---

[6] Qwinstar also alleges that Anthony sold Qwinstar's parts to third parties and pocketed the proceeds (Am. Compl. ¶¶ 41, 61), but, since Qwinstar has not advanced this theory in its briefs, the Court does not address it.

[7] The APA and the EA are governed by Minnesota law (Shannon Decl. Exs. 15, 16), both sides cite Minnesota law, and neither side asks the Court to apply the law of another jurisdiction. Accordingly, the Court will apply Minnesota law.

law."  Cherne Contracting Corp. v. Marathon Petroleum Co., LLC, 578 F.3d 735, 740

(8th Cir. 2009) (citing Denelsbeck v. Wells Fargo & Co., 666 N.W.2d 339, 346 (Minn.

2003)).  The plain and ordinary meaning of unambiguous contractual language controls.

Metro. Airports Comm'n v. Noble, 763 N.W.2d 639, 645 (Minn. 2009).

        Here, the validity of the APA is undisputed.  It provides that Qwinstar purchased

"assets . . . used or otherwise relating to the 3890 Business . . . [including] all finished

goods, raw materials, work in process, packaging, parts, supplies, tooling and other

inventory" owned by Pro Logistics on October 1, 2013 (the APA's "Effective Date").

(Shannon Decl. Ex. 15.)  Neither party argues this provision is ambiguous, and, in the

Court's view, it is not:  Qwinstar purchased "all" of Pro Logistics's 3890 parts.  Yet, the

APA contains no additional description of the goods Qwinstar actually purchased, and

the record reveals no accurate list.  Indeed, the incurable defect in Qwinstar's claim is its

failure to inventory the assets it purchased.  Each Qwinstar employee who toured Pro

Logistics's warehouse prior to execution of the APA estimated that the inventory

Anthony provided was accurate.  (Atchley Decl. ¶ 11; Grunberg Decl. ¶ 9; George Decl.

¶ 3.)  But Qwinstar never conducted an inventory of its own.  (Atchley Dep. 170;

Diadone Dep. 50–51.)  Instead, Atchley testified that Qwinstar "had done business with

[Anthony] for many years . . . We took him at his word that he had what he had . . . We

visit[ed] his facility.  We did a tour.  We had ongoing discussions with him . . . That's

about it."  (Atchley Dep. 69–71.)  Atchley observed that "a lot of this inventory was in

cabinets with doors . . . [and] there [were] locks on the doors."  (Atchley Dep. 103.)  But

he did not know whether these cabinets were actually locked and, regardless, he admits

he could have asked to look inside.  (Id.)  He simply chose not to do so.  As a result of Qwinstar's reliance on its employees' vague affirmations, it has no evidence of precisely which 3890 parts it purchased.

To overcome this hurdle, Qwinstar cites Anthony's pre-contract statements and the inventory list he prepared in January 2013, arguing that the parties' transaction undisputedly involved "many millions of dollars of inventory."  (Pl.'s Mem. Supp. 17.) From this, Qwinstar attempts to account for the parts it knows Anthony provided—in its view, roughly $635,000 worth—to argue Anthony and Pro Logistics are "more than $3.7 million short" from the $4.4 million Anthony initially estimated.  (Id.)  But the Court is unpersuaded for several reasons.

First, the APA "constitutes the entire agreement between the [p]arties . . . superseding all oral and written proposals, representations, understandings, and agreements previously made" (Shannon Decl. Ex. 15, ¶ 7.6), and it makes no mention of Anthony's inventory list.  The agreement could be modified only in writing (id.), but no written modification referencing Anthony's list appears in the record.  Second, Anthony conducted the inventory *ten months* prior to execution of the parties' contracts.  During this lapse, Pro Logistics continued to sell 3890 parts, and Qwinstar was aware of this at the time.  (Diadone Dep. 37.)  Despite knowledge that Anthony's inventory had become stale, Qwinstar never asked for an updated list before signing the APA.  Instead, it "made a judgment" that an updated inventory was not necessary.  (Atchley Dep. 170.)  There is thus no evidence that Qwinstar purchased any particular item shown on Anthony's inventory, and any assertion to the contrary is speculative.

- 11 -

In sum, Qwinstar cannot prove which parts it actually purchased nor the value of those parts on October 1, 2013, so no reasonable jury could find that Anthony or Pro Logistics breached the APA by failing to provide "all" parts without resorting to speculation.  In the absence of a genuine issue whether the APA was breached, Anthony and Pro Logistics are entitled to summary judgment.  Cherne Contracting Corp., 578 F.3d at 740; see also MAS Prod., Inc. v. MAS Acquisition, Inc., No. A11-1254, 2012 WL 612318, at *4–5 (Minn. Ct. App. Feb 27, 2012) (affirming dismissal of breach-of-contract claim where buyer knew inventory records provided by seller were not accurate).

Qwinstar also alleges that Anthony breached the EA by working outside Qwinstar. (Am. Compl. ¶ 44.)  As mentioned, the EA required Anthony to devote his "full business time" to Qwinstar.  (Shannon Decl. Ex 16.)  Anthony acknowledges that, by December 2014 or early 2015—coincident with his termination—he had accepted full-time positions with other companies.  (Anthony Dep. 23.)  Even so, Qwinstar has recognized that the EA does not explicitly prevent Anthony from obtaining outside employment, even though the parties could have included such a clause.  (Diadone Dep. 66–68 ("The agreements say what they say. If it's not specific enough, shame on us.").)  Moreover, Qwinstar admits that it was possible for Anthony to work full-time and maintain outside employment (id.), and it fails to explain how Anthony's actions (i.e., applying for and obtaining outside employment) prohibited him from devoting his full business time to Qwinstar.  Indeed, it has failed to address this portion of its claim in its briefs.  See Fed. R. Civ. P. 56(c)(1) (The party asserting a fact "must support the assertion by citing to particular parts of materials in the record.").  Since Qwinstar has failed to present a

triable issue as to whether Anthony devoted his "full business time" to the company,

Anthony is again entitled to summary judgment.

## II.   Qwinstar's remaining claims

Qwinstar also alleges fraud, arguing that Anthony misrepresented Pro Logistics's

parts inventory, sales numbers, and customer base, which induced it to enter the EA and

the APA.  To survive Anthony's Motion, Qwinstar must present evidence of

(1) a false representation of material fact made with the intent to induce Qwinstar's

reliance thereon, (2) Qwinstar's actions in reliance, and (3) damages.  Valspar Refinish,

Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 368 (Minn. 2009).

To the extent Qwinstar's fraud claim is based upon Anthony's 3890 parts

representations, it is simply a restyling of Qwinstar's breach-of-contract claim, and it fails

for the same reason:  Qwinstar never inventoried the parts it purchased.[8]  It admitted it

has no evidence that Anthony's representations regarding Pro Logistics's inventory were

false (Atchley Dep. 80–81), no such evidence appears in the record, and, at any rate, "the

signatory to a contract cannot prove reliance on a pre-contractual representation that is

inconsistent with the terms of the contract."  MAS Prod., Inc., 2012 WL 612318, at *6.

Moreover, three Qwinstar employees viewed Pro Logistics's inventory prior to execution

of the APA, and each saw a volume of parts consistent with Anthony's inventory list.

Qwinstar's own investigation thus belies its claim that Anthony's statements were false

and further undermines its supposed reliance on Anthony's list.  Similarly, Qwinstar has

---

[8] This theory also appears to contravene the economic-loss doctrine, which provides that "economic loss that arises from a sale of goods between parties who are each merchants in goods of the kind is not recoverable in tort."  Minn. Stat. § 604.10 (1998).

cited no evidence that Anthony's representations regarding Pro Logistics's sales or customer base were false; it admitted that Anthony never promised it new customers, and it is "not in a position to" dispute Anthony's claim that Pro Logistics had sold parts to certain customers in the past.  (Atchley Dep. 90–93.)  Anthony's "economic prognostication, though faulty, does not, without more, amount to fraud."  In re Metris Cos., Inc. Sec. Litig., 428 F. Supp. 2d 1004, 1010 (D. Minn. 2006) (citing Polin v. Conductron Corp., 552 F.2d 797, 805 (8th Cir. 1977)).  For those reasons, Qwinstar's fraud claim will be dismissed.

Qwinstar's remaining claims for conversion and civil theft are likewise defective. Conversion is "an act of willful interference with personal property done without lawful justification by which any person entitled thereto is deprived of use and possession." DLH, Inc. v. Russ, 566 N.W.2d 60, 71 (Minn. 1997) (internal quotations and citations omitted).  Similarly, "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen."  Minn. Stat. § 604.14.  To prevail on these claims, Qwinstar must identify the converted or stolen property and, for the reasons discussed above, it is unable to do so.  Accordingly, these claims will also be dismissed.  See Robert Allen Taylor Co. v. United Credit Recovery, LLC, No. A15-1902, 2016 WL 5640670, at *10 (Minn. Ct. App. Oct. 3, 2016) (dismissing theft claim based on same facts as non-viable conversion claim).

## III.    Anthony's breach-of-contract claim

Anthony counterclaims that Qwinstar breached the EA by refusing to pay his salary since December 2014.  (Answer ¶ 102.)  Qwinstar responds that, since it

terminated Anthony for cause, he is not entitled to payments after his termination date.

(Pl.'s Mem. Supp. 18.)  In the Court's view, the EA entitles Anthony to his full salary,

even if Qwinstar had cause to terminate him.

Section 4 of the EA provides that Qwinstar "may terminate [Anthony]'s

employment at any time for Cause."  (Shannon Decl. Ex. 16.)  "Cause" includes the

> failure to follow the lawful written instructions of a responsible employee
> of [Qwinstar] to whom [Anthony] directly or indirectly reports . . . [the]
> failure to substantially perform [Anthony]'s duties as an employee . . . [the]
> commission of any fraud, embezzlement, misappropriation or other
> material act of dishonesty against [Qwinstar] . . . [or] any breach of any
> representation, warranty or covenant contained in the [APA].

(Id.)  In the same section, the EA further provides that,

> If [Anthony]'s employment . . . is terminated . . . [Qwinstar] will have no
> further liability to [Anthony] under this Agreement other than to pay [him
> his] Base Salary and benefits . . . accrued . . . through the date of
> termination or resignation; provided, however, that if this Agreement is
> terminated *under Section 4 for any reason*, [Qwinstar] will continue to pay
> [Anthony] (or his estate in the event of his death) the Base Salary for the
> balance of the five-year Term of this Agreement remaining after the date of
> any such death or Disability.

(Id. (emphasis added).)[9]  In addition, Section 4 provides for termination of the contract

upon Anthony's resignation, death, or disability.

This poorly-drafted provision is internally inconsistent: under the first clause, if

Anthony's *employment* is terminated, Qwinstar owes him nothing beyond his salary and

benefits accrued through his termination.  However, the second clause guarantees

---

[9] The parties' have submitted two versions of the EA, and they dispute which version controls.
(See Pl.'s Mem. Supp. 7; Def.'s Mem. Opp'n 29.)  Qwinstar contends that the above-quoted
language controls, while Anthony offers a broader version.  (Answer, Ex. 2.)  The Court relies
upon Qwinstar's version in considering Anthony's Motion.

Anthony his full five-year salary if *the Agreement* is terminated "under Section 4 for any reason," but Section 4 specifically addresses the termination of Anthony's *employment*. Fortunately, the Court need not reconcile these conflicting provisions, as counsel for Qwinstar drafted the EA (Grunberg Dep. 37–38), and ambiguous contracts are construed against the drafter.  RAM Mut. Ins. Co. v. Rohde, 820 N.W.2d 1, 15 (Minn. 2012). Qwinstar recognized that Anthony expected guaranteed compensation "regardless of his status as an employee" (Atchley Dep. 114–16), and, as mentioned, Anthony's salary under the EA was "really the vehicle to pay for the parts" Qwinstar purchased under the APA.  (Id. 36.)  Accordingly, the Court determines that the second clause controls:  it guarantees Anthony the remainder of his salary following termination under Section 4. Qwinstar cited Section 4 in its termination letter to him, and it repeatedly acknowledged that it terminated Anthony for cause.  Qwinstar thus breached the EA by halting payments to Anthony, and Anthony is entitled to $800,000, the balance of his salary under the EA.  Qwinstar's claim for a declaration that it is not obligated to pay Anthony (Count VI of the Amended Complaint) will be dismissed.

Finally, since Anthony is entitled to relief on his breach-of-contract claim, the alternative claims for relief (fraud, unjust enrichment) are subject to dismissal to avoid double recovery.  (Def.'s Mem. Supp. 39 (citing Wirig v. Kinney Shoe Corp., 461 N.W.2d 374, 379 (Minn. 1990)).)

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 42) is

**GRANTED**, Plaintiff's Motion for Partial Summary Judgment (Doc. No. 50) is

**DENIED**, and Plaintiff's Amended Complaint (Doc. No. 5) is **DISMISSED WITH**

**PREJUDICE.  IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendants shall recover of Plaintiff the sum of $800,000 on their Counterclaim.  All

other pending Motions are **DENIED AS MOOT.**[10]

    **LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date:  November 17, 2016                    s/Richard H. Kyle
                                            RICHARD H. KYLE
                                            United States District Judge

---

[10] Anthony's claim for attorneys' fees should be pursued as provided by Federal Rule of Civil Procedure 54(d)(2).